Mr. Williams' Rule 60B3 motion, although filed outside of the time limitation of the rule, was timely because equitable tolling applies legally, meaning that because of the time limitation of the rule, equitable tolling applies legally. Because Rule 60B's time limitation is an affirmative defense, equitable tolling applies, and it applies factually, lining up this court's case law on what is required for 60B3. Do you deal with the legal determination that it applies to Rule 60B in light of the Marsh case and the way it treated that particular issue there? Well, argument is that Marsh doesn't apply because that's about the federal rule of appellate procedure, but your honor, I think it's easier than that. This court has said in McRae, well, let's not brush off Marsh so easy. It did apply to it, but look at the reasoning. I mean, it looked at that Rule 4, definitely relevant, and it said, okay, it doesn't apply here, and then it looked at a separate rule and saw that it was accepted out of it, and then came to the conclusion that it didn't apply there. You kind of have a similar pattern here. You got a specific rule, then you got other rules that sort of doesn't include that 60B. So don't brush it off so easy, at least from my perspective, in terms of the rationale. Yes, two different things, but they're kind of talking, the rationale is the same. Yes, Judge Winn, and I think the rationale comes down to rule by rule, whether they're jurisdictional, claims processing, or affirmative defenses. Remember that it's not Rule 60B that we're talking about. It's the time limitation of 60B, and this court's case law in McRae has called that an affirmative defense, and this court's case law in Prescott, 221 F3rd 128, has stated that an affirmative defense is subject to equitable tolling. I didn't find a case, have we ever done this in this court, granted, found it to be equitable tolling on Rule 60? I have not found one, Judge Winn. How about other searches? I did not find one in a search on either time before the reply brief or before this oral argument. But we're finding pieces where consistently the time limitation on Rule 60B3 is considered an affirmative defense, and then in other cases, not talking about 60B, consistently talking about affirmative defenses being subject to equitable tolling. Our first defense, no pun intended here, is that the government did not raise this issue below and has been waived. But even if not waived and the district court didn't take this up below, we submit that this court's case law already settles this, albeit not in a published decision that talks about both Rule 60B's time limitation and the affirmative defenses are subject to equitable tolling. I really appreciate your thoughtful answers to my questions. Okay, if you got equitable tolling, tell me about those eight months that it took to file this motion after you received this new evidence. How's that going to work in your favor? I mean, even if you got it, if it does allow it, how are you going to get over that hurdle? That it took Mr. Williams eight months to file his motion? That's right. I would only say he's a pro se litigant prisoner without the resources of an attorney, without the resources of someone who's not in prison. I think his track record is exceptional when it comes to diligence. He's working as quickly as he can under very difficult circumstances, sometimes without a law library, sometimes in solitary by no fault of his own just when the prison's on lockdown. I can't speak to, there's nothing in the record that tells me exactly what's happening in those eight months, but the record does show that this gentleman is doing everything he can to get the evidence he needs to prove what he believes is true. And if it takes him eight months in prison, that might take us two or three months on the outside. Either one's out of time. And his efforts in some sense have been herculean compared to trying to get information from North Carolina and those things. He's battling statutes that tell attorneys not to help him. He's battling agencies that refuse to disclose information to him. He's battling briefs that we're not accusing the government of malicious conduct, but briefs that misrepresent what's actually happening in the North Carolina investigative bureau concerning analysts and the accuracy of those analysts' tests and the credibility. The problem with that is all of that was known. And then he took eight months. He wasn't battling that after doing eight months. He knew at that point he had this evidence for God's visit that was there. Yeah, I guess I put myself in the shoes of Mr. Williams, and he finally has that smoking gun, and now he says I better write the best brief I've ever written. And I bet that didn't happen overnight. What can I say, Judge Williams? I'm with you on the pro se. I mean, at some point in time, you know, it seems as though someone who gets a lawyer, you ought not get a lawyer. You ought to go pro se because you're going to get more rights by just doing it yourself than if you get a lawyer. If you get a lawyer, take eight months, oh, yeah, you wouldn't even be in here. But you're basically saying, you know, if you don't have a lawyer and you know that everything's there, then our rules, at least in the equitable totem, if it applies, would be there. I mean, I got it in terms of going back and forth with North Carolina, but that had already been done. That's the problem I'm seeing here. The day I get to argue that court-appointed attorneys should be appointed for these types of issues so we don't wait eight months will be one of my happiest days. But until then, we have to deal with the reality that you're an indigent prisoner fighting for yourself. You don't have the right to counsel. You don't have a family member who's going to write a check to an attorney if you'll find an attorney to take the case. I have a question about the underlying facts. In your brief, you say that Bissette was fired or forced to resign from the FBI. Where is the record support for that? I'm not going to be able to cite the JA, but that is going to come from the attachments that Mr. Williams filed in one of his 60B motions where they uncovered, I believe it was Attorney Heather Radelaids. In her letter, the attorney says that Bissette was fired or forced to resign from the FBI. She just says that. I don't see any record support even in attachments to her letter that Bissette was fired or forced to resign. Rather, it appears she retired. Now, there may be questions about the timing of her retirement. I was just wondering if there was any record support for that. I don't believe it. I'm sorry, Judge Schenker. No, go ahead. I don't believe we have authority beyond that letter. I don't think it's that letter plus something. I think we're relying on that letter. All right. If equitable tolling applies legally, we move to equitable tolling applying factually. The first element under Holland is diligence. I don't think anybody's questions his diligence. The district court did not deny him based on a lack of diligence. The government has never argued he hasn't been diligent. It comes down to extraordinary circumstances. Unconscionability and a gross injustice if we were not to have this issue heard, if the 60B were not granted to allow Mr. Williams to finally get to argue that counsel was ineffective in these ways. It is not the same standard as the merits of the Rule 60B when it comes to misrepresentation, but there is some overlap. There's misrepresentation by the government, and the district court erred in failing to find so because the government made it sound like it knew for a fact. It had investigated and knew that there were no reasons to question Analyst Bessette. There were no reasons to question the SBI, and that therefore there were no reasons to question her credibility in her testimony, the credibility of the DNA report that she issued saying that this was Mr. Williams' blood, and therefore that misrepresentation means that Mr. Williams still has not had his 2255 ineffective assistance of counsel arguments fully litigated today. On this record, there should be no confidence that if the district court Didn't Mr. Williams know in March of 2011 that there were, quote, troubling cases that included Bessette and Barker? He had suspicions, and I have nothing in the record to point to to show that he knew. He has said to me he has, but there's nothing in the record to say that before that date he had knowledge. He had suspicions because his position is he wasn't even there, and if you're not even there on that July date that is the basis of counts six and seven, you're going to very strongly believe something's wrong with the DNA test that says you were there. On this record, there should be no confidence that if the jury heard reasons to doubt the scientific evidence, it would have not found Mr. Williams guilty. We don't, as I think the government seems to suggest, need to prove he's going to win his 2255 because we're simply saying that the Rule 60B should have been. So what is your best argument that he wouldn't have been convicted absent the blood evidence? Because the testimony conflicted on whether he was even there, and so the government relies on the DNA. How did it conflict? You're talking about the probation officer? Yes, the probation officer. You saw him at 6 p.m.? Yeah. What time was the shooting? What time was the crime committed? I'm not remembering that off the top of my head. I don't think it's in the record, is it? Maybe it is. My suspicion is it is, and I just don't remember. Oh, okay. But I will look at that during the break. It must have been sometime around 6 p.m. for your argument to be that there's conflicting. Four to five, but I will look at that if you'll give me that chance, Your Honor. And I already forget where I was. You're talking about the aspect of it makes it unusual, unconscionable, you mentioned that word. I can't think of a, to call this ordinary is either an admission of the government that things like this happen all the time, which is disturbing, or is worrisome that we'd have more cases like this and we just don't know about it, and Mr. Williams is extremely lucky to be in a position that he's able to find that evidence for what Chief Judge Gregory has mentioned as Herculean efforts to get the evidence. And if there are no more questions, I'll reserve my time. Thank you, Mr. Brandt. Thank you. Ms. Greenough. May it please the court. Elizabeth Greenough on behalf of the United States. This court should affirm the district court's dismissal of Williams' Rule 60B motion as untimely. And before I address the mandatory claim processing rule, I'd like to address the significance of the district court's factual findings, because Williams' claim both for equitable tolling and his claim for relief under 60B both depend on those findings, showing that misconduct was committed by the United States. The district court did not clearly err in finding that the United States did not engage in such. I think the threshold issue is whether equitable tolling applies to Rule 60B. Correct, and I'm happy to go straight to that, Your Honor. I was wondering why you wouldn't, because if you go there, why discuss all this if it doesn't apply? And I'm not saying it does or does not, but if we're the first time doing it here or in any other circuit, and I'm particularly interested in the Marsh case and its impact here. Yes. As well as the Lambert case and how that applies here and whether in fact there is such a thing as equitable tolling for Rule 60B. Based on this court's decision in Marsh and the Supreme Court's decision in Lambert, I don't think that equitable tolling applies here because it is a mandatory claim processing rule. And what both those courts have said is that when you're looking at whether or not a rule is a mandatory claim processing rule, you have to look to the text of the statute and also whether or not the text leaves room for flexibility such as equitable relief. And here we know that there is no such flexibility. Rule 60C1 says that a motion under Rule 60B must be made within a reasonable time and for reasons 1, 2, and 3 no more than a year after entry of the judgment or order. And then when you look to Rule 6 of the Federal Rules of Civil Procedures, it carves out an exception when it talks about extending time saying under Subsection B, in general, a court may extend time for good cause. However, a court must not extend the time to act under Rule 60B. So given that you have— You think that's like Marsh case on Rule 4. They found another statute there except for that 4. Correct. And under the Federal Rules of Appellate Procedure 26, that's very similar to Federal Rule of Civil Procedure 6 talking about extending the time. And that's exactly what the court was looking at in Marsh in deciding whether or not there was an exception carved out that made this rule inflexible. Well, you know, is there a difference that would deal with procedural rule there? And herein you're dealing with a matter of fairness. Are there different principles we ought to consider, notwithstanding the similarity in terms of the reasoning? I don't think so, Your Honor. If you look at the advisory committee notes for Rule 6 from 1946, when that limitation, that time limitation, was put into place, the concern there was finality. It was important that when you're dealing with a post-judgment motion, which this is, and the other—Rule 6 includes other rules like Rule 59. When you're dealing with something that would set aside the finality of a verdict, it's important to know that at some point that's going to be final. That serves the interests of finality. In other words, we're going to live with it a year. No matter what happens, once a year happens under Rule 60B, that's what you're going to get. As the subsections 1 through 3. And, in fact, it used to be six months. So they extended it at the time that they put the rule into place to make it a year. But yes. So we would submit that equitable tolling doesn't apply here. Well, even if it does, assume it does apply, that, you know, the eight months is something we ought to consider in light of the fact that, well, he's pro se and he's in prison. A lot of things are going on. A lot of moving parts are happening here. And that's a consideration we ought to take into account. That's true. But if, as Mr. Brandt represented, this was the smoking gun that he had, he does not explain at all. And it's his burden in this context to show that he meets the equitable exception. It's his burden to show due diligence. And he has no explanation for that eight-month period. And this court has found even a three-and-a-half-month delay in bringing a 60B motion may not show diligence. Was that three-and-a-half? It was an employment case. I'm not sure whether he was pro se or not, Your Honor. But, Ms. Green, isn't this case different? Finality does not loom as large as it normally is. Normally finality comes in in the sense that, well, listen, you've had your time and you're going on and on and on. It's sort of the progenitor is solely normally the petitioner. But here the moving part is disclosing and understanding what the science was that convicted this man and what implications there are. This is something different. In this case, for example, was there any evidence that he was shot other than somebody said he was shot? I mean, for example, like the hospital records. I mean, was there? There were two people who said that he was shot. One was the witness, Ortiz, for the United States who testified as to the robbery because he was one of the victims. The other was Malik Muhammad who had seen him with a sling on, and Williams at that point told him that he had been involved in a robbery and gotten shot during that. So the person who supposedly shot him didn't testify that he shot him, right? Correct. I believe that there were three people who were victims of the robbery. I believe two of them maybe went into the wind after this happened. So we did not have testimony from those two. But did you have any evidence that physically that he was shot? I mean, you could do that. That's not a testimony. You could actually look at his body, couldn't you? I mean, you took the time to get blood from him, right? After getting a court order, yes. That's what I'm saying. You could have done the same thing there. Because it's interesting that the person who took the picture couldn't identify blood on the plastic bag. Right. But there was testimony not only from Officer Johnson who originally noticed that stain on the bag. There was also testimony by Agent Barker that when she went to examine the bag to see whether there was blood evidence that she could see it, that it was visible to the naked eye. So it wasn't just one person saying that. What time was the crime? The crime took place around 4.30 in the afternoon. So what about the probation officer's testimony that she saw him, I guess, at 6? So the probation officer who testified, Pam York, was not actually the probation officer who saw him that evening. She said that her co-worker, John Green, had gone by Mr. Williams' home around 6.39 p.m., I think. How is that admissible? She's testifying about what another co-worker had done? I think there were records, so it was a written report. So John Green goes around 6 o'clock and what does he see? She testified that the standard procedure under that circumstance is to pull into the driveway, beep your horn, and wait for Mr. Williams to just stick his head out the door so that she could verify or John Green could verify that he was there. And we also know from... Did he verify he was there? Yes. Okay, I thought there had to be some other piece to that.  But that isn't evidence that Mr. Green saw his whole body and whether he was shot or not. He only saw his head and he wasn't shot in the head. Right. And I think it would have been... Is that your point? Yes. So... Why wouldn't the government want to clear this up? Well, Your Honor... I mean, you've got someone who, you're keeping the records from him. Your Honor, I would disagree with that. No, how do you disagree with my question? You're assuming that we're keeping the records from him? Well, no. I said, why wouldn't you want a full disclosure about this scientist, your forensic expert, given how important this case is? I don't... Let me just put this... You're the government, right? Yes. So the government ought to represent fairness and openness. You took this case as a federal case, right? Yes. So why wouldn't you try to get the state to say, North Carolina, we need to know this. A person's life and liberty hangs on the balance. Why wouldn't you? When he was in prison trying his best to get this information, why wouldn't you be a partner to trying to get to the truth? And the truth could be hurting him. The truth is the truth. It's not defending him because you have a greater burden. Your burden is not to win. Your burden is to make sure justice occurs. So my question is, why wouldn't the United States government, with all of its wherewithal, try to get to the smell of this? Did you really look at this man when you didn't find him in the database? And then you said, court order, let's get his blood. And then you examine, oh, that's him. And on the same week, right? I mean, I don't know what the evidence is. Is the evidence the same week or is that not in the record? It's not in the record. It is in the record. But the point is, you take these cases from the state. Why shouldn't you have to? Why wouldn't you? Why wouldn't you? Well, I want to make clear that the evidence that you're talking about, I think, which shows that Bassett may have switched or mislabeled two samples, that evidence that that happened didn't come out until 2005, which was after the time of trial. I know that, but in terms of the process post-trial, why aren't you a partner in trying to get that out so that you can have it? Isn't that important to a person's life? When we're dealing with the post-conviction context, this is a civil proceeding. Mr. Williams was already fully and fairly convicted. He already had his chance to appeal. You said he was fully and fairly convicted? That is the presumption. Once he's had his conviction and it's been affirmed by this court on appeal, then he's bringing a motion to vacate in which he carries the burden of proof. So he has to come forth with the evidence to show that there was something wrong. And we're not trying to cover anything up. Carolina said he couldn't get it. My question to you in terms of why didn't you help, that's a simple question. Sure. Whatever the answer is, why wouldn't you help? We don't have a burden in the post-conviction context. The Supreme Court has said this in the Osborne case from 2009. I think the point is the government's burden is to see that justice is done. That's the burden. So why wouldn't you help? Because we, and Ms. Ray will tell you this, we did not have that evidence. And it is not the normal course of events. Not that we don't act with honesty and integrity and try to reach the right result in every case. But in this particular instance, you have 13 different claims of ineffective assistance of counsel. We're responding to what Mr. Williams argued in those motions. Are you saying at the Habeas proceeding for the Rule 60 that the government at that time did not know that the bloodstain was tainted or that the evidence from it might be unreliable? I am saying that. And I don't think that Mr. Williams has shown even today that that evidence was unreliable. Where was the information of this at that time? In other words, it's one thing to come in. Of course, counsel may not know it. But that doesn't make you blind to asking those that do know it. Was there not an investigation of something going on at the time? Or was it something new? Are you talking about with respect to the FBI? Regarding the Habeas proceeding. Was there anything going on at that time when the representations made there was no evidence that it was in a taint to anything? Was there anything going on with the law enforcement agency to indicate to the contrary? I can't speak to that. I was not involved with this. Wouldn't it be the duty of the government to know that? That if you have something going on, I mean, because who else? You've got the FBI. You've got all kinds of agencies there. If you get up in court and say there's no evidence, aren't you essentially saying that there's nothing there? The law enforcement, no one has found any indication of that. Because the representation was made, there was no evidence that the bloodstain was tainted or that the evidence confirming that it was Williamson's blood on the bag was unreliable. But you knew there were general issues with the FBI, didn't you? That's the number of this question. It's really going there. You might not know the specifics, but you knew something was going on with the FBI at that time. So the information that he provided, Mr. Williams provided with respect to the newspaper article was talking about issues in terms of blood pattern analysis  But what came in at trial in this case was the actual DNA analysis. And I want to make sure we're looking at this as well in the context of this is an ineffective assistance of counsel claim. So it's important to go back to what his attorney knew at the time of trial. And he has to make that showing in order to obtain relief. And I don't think that any reasonable jurist would have felt compelled given the evidence. What he knew at the time of trial is determining on what's being told to him. I mean, even a lawyer in that perspective can't make a motion you don't have any information. But the point I'm asking on the Havis proceeding, at that time there was an FBI investigation going on and it involved Bissett. I know she's made some mistakes there. But for the government to stand up and say there's no evidence that this blood was tainted or that the evidence was unreliable may technically be true, but it's true because maybe you aren't looking or maybe you didn't ask. Well, Your Honor, I do take issue with you saying that it's a misrepresentation. I mean, even if you're saying it's technically true, all of these statements were made and the district court found this in the context of responding to Williams' argument for relief under 2255. And he has the burden in that proceeding to make the showing. So saying the article identifies problems at the FBI's laboratory. It, talking about the article, does not suggest that the DNA testing was deficient or inaccurate. That's a true statement. Technically true. You're right. The problem is there's a lot more to that statement that has not been disclosed. And yet, how are you going to carry a burden if you don't know and all the information is on the other side? I'm telling you. It's not an easy burden and it's not supposed to be. This is an impossible burden when you think of it in that light. You've got a burden to come in and say there's evidence. You've got all the other evidence on the other side. You've got people who know this stuff, but you come in and say there's no evidence of it, nothing here. And you're right, technically, because technically there is no evidence in the court because we don't know what's going on outside. So a habeas petition at 2255 is not a chance to retry the case. It doesn't involve reopening all the discovery and looking at everything that's already been done. You have to preserve resources at some point. And in this instance, all we were doing was responding to the allegations he made. He has the burden of proof. I'm not saying it's an easy burden to meet. It's not, but that's by design. You never answered Judge Wynn's question. The question is, he said at the time you made the representation that there was no evidence, didn't you know that something was amiss as to this SIB in terms of the examination of the blood, right? That's the question. Would you answer that question? Did you or didn't you know that there was something going on about that lab and that examiner at the time you made the reference? Forget about what that representation means. The question now is temporal. At that time, did you know, and you, not just you, the United States government, know that there was some problems with that lab and that examiner? That's a yes or no question. I don't believe so. I believe the answer is no. You don't believe so? Are you based on your knowledge? I want to make sure how you qualify in your response. I can't speak for everyone. But you have to because you represent the United States today. Well, I don't want to make a misrepresentation to you. The Fourth Circuit never accepts dead answers. I didn't try. I wasn't a lawyer. You're the United States here. I did not know it. I know Ms. Bray did not know it when she made the representation in the underlying submission. That's all I can tell you, Your Honor. So you know nothing about officers, officials in terms of investigators, nothing like that? What they knew? You don't know? I'm not sure. You're asking me do I know about investigators? You don't know. There was never any discussion in terms of something was going on in terms of North Carolina in that situation. That was totally surprising to you, the news article, all that. Correct? That's what you're saying? I'm sure someone was aware of it. Someone in the United States government, prosecution, investigation? Given the frequency with which we probably use the State Bureau of Investigation, I would say yes. Isn't that attributable to you, the United States? If law enforcement knew that? If law enforcement knew it, yes. I do, again, want to emphasize the fact that the particular evidence you're talking about did not come out until after trial. Oh, I know. I know. That's why we're talking about it at the time of the representation. Okay. Right? It had to be. I want to go back just for a minute to the Rule 60B where my colleague suggested that the government had waived its defense by not raising the untimeliness of the Rule 60B motion. And, in fact, we did raise that timeliness issue before the district court. What I said in my brief was that we had not argued that equitable tolling didn't apply. But we obviously are raising that issue now. I also want to talk just briefly about the underlying North Carolina statute that Mr. Williams claims prevented him from obtaining this information. If you look at North Carolina General Statute 126-23, that statute wasn't amended until 2011 to place that restriction in terms of employee records on incarcerated individuals getting that information. So there was a period of time where he could have gotten that information. And, in fact, he requested it in 2010. That's when he received the information from the SBI. So that, I don't think, his making a FOIA request to the state and expecting to have So he had that information at least as early as 2010? Correct. Yes. Which information did he have in 2010? He had the information that She retired? She had retired and the other person was on administrative duty. And he put in his submission And how does that help him? Not why the other person was on it? Why they retired? It did not. But if you look at Government S.J.A. 642, he did argue in his original 2255 that the timing of that showed misconduct. He argued that in 2011? Correct. And the United States government didn't get involved at all in trying to figure out why she was retired at all? Is that right? That's a representation to the court? I would imagine we did not. I don't have personal knowledge of that. Can you imagine that they wouldn't do that? I would not think so. So personal records of the state are protected by state law. Once the criminal case is over, I'm not sure how we would get the access to that. I see that my time is up. If there are no further questions, we would ask this court to affirm the district court's decision. Thank you. Thank you. Ms. Green. Mr. Williams respectfully submits that the government wants to use Ms. Bissette when she has some information that helps its case, but doesn't want to share when it turns out that the exact same week that she's testing the evidence that it used in its case, she made critical errors and that wasn't her first mistake. It wasn't her second mistake. It was at least her third mistake. Mr. Williams argued in his 2255 motion that his attorney was ineffective for failing to test the blood and for failing to research Bissette and the SBIs past and its mistakes. He was prevented from getting that claim fully vetted in the district. Would counsel at the time of trial have known about past mistakes? He might not have known, but Mr. Williams requested that his attorney investigate, and it turns out that her mistakes dated back to at least 1999, which did predate the trial. He requested that at trial? He requested that of his attorney. Right. Yes. And in the record that's only shown from Mr. Williams sworn. And he did so because, as you said, he said, I wasn't there, so how in the world, I don't care if the best, I'm not speaking for the logic of it is, I don't care if the best blood expert in the world did it. If I'm alleged, I don't know if it's true or not, that I wasn't there, something is wrong. So, I mean, I can see why he would say it's consistent. Listen, you better do something with testing that because I wasn't there. I don't know if it's true or not, but that would be the framework of saying even a layperson at trial would say, you're my lawyer, but I'm telling you this, that's got to be wrong. And the government's statement found at JA133 was that the evidence that Mr. Williams alleged existed to show that he was correct, the government's response is that it was, that there's no reason to believe that this evidence, quote, that the petitioner's blood on the bag was unreliable. There was no reason to not believe that. And we respectfully submit that that's not a technicality, true or false, that's simply false. When my colleague mentioned what I was trying to say about waiver, the waiver argument is that equitable tolling was not raised as an affirmative defense. Yes, timing, of course, was raised because the rule gives us a time limitation. The government, of course, raised that. What we're saying is the government didn't raise the equitable tolling affirmative defense below and waived that. I didn't finish my answer to Judge Thacker about why there's reason to believe that the DNA evidence credibility was important to the jury. It was not only the conflict of the testimony, but it was also because it was testimony that there was only one man seen running away from the scene. And the government's case was built around two men running, and one of them is Mr. Williams. And as for the legality, equitable tolling applying as a matter of law, and what Judge Wynn apparently is wrestling with, like, how do we find that equitable tolling applies? Is there a reason to believe that equitable tolling applies? I think the rationale might even be found in the Supreme Court's Holland case and the fact that we're applying equitable tolling to habeas generally. And Holland's about 2244. And we're finding equitable tolling in this court applies to 2254, 2255. And if Rule 60B is meant to reopen a habeas, any of those numbers that I just gave, any of those statutes, if it's meant to reopen those because there's a problem in the integrity of the proceedings, why would it not be right then to apply that same equitable tolling to 60B to reopen what we were saying equitable tolling could be applied to make sure the right result occurs in that underlying habeas? And Holland at 646, if it helps. And then if it does apply, Judge Wynn also asked about the eight months. What was your answer to the why the eight-month delay? I've got nothing in the record that I can point to to say because that simply wasn't fleshed out. I think our best argument is the district court judge didn't deny us on diligence because look how diligent he was. And we haven't gotten a factual ruling below. Now, we wouldn't, what do we want, right? I guess we're going to ask that the court find that the district court erred, find that equitable tolling applies as a legal matter, find that equitable tolling applies factually to the law, remand with instructions that are consistent with those rulings, that the district court find that he's not only allowed to make that argument, he's timely and he wins his 60B so that the 2255 is reopened. And if there's any matter that keeps Mr. Williams from getting to that point, because the district court judge dismissed his equitable tolling argument in a footnote, so merely in a footnote claiming Mr. Williams did not even argue equitable tolling, even though page after page is about Holland and how he meets equitable tolling, traditional equitable tolling, we would ask as an absolute last resort that the district court hold an evidentiary hearing. If this court has any questions that he can't win because there's not enough facts, why are we not having an evidentiary hearing? And it's because the district court is not even letting him get to that point. It's simply saying summarily in a footnote, you lose. The man has never had this core issue litigated. He's been blocked at every turn. And we ask for justice, and I appreciate the court's time. Thank you, Mr. Brandt. Thank you, Mr. Green. And Mr. Brandt, we particularly want to highlight and thank you for your service as a court-appointed counsel. We rely upon lawyers like yourself to do that, particularly cases like that, and appreciate your fervor in the case as well in terms of representing those who are indigent and require court-appointed counsel. And of course, Mr. Green, we thank you for your able representation of the United States. We'd love to come down and greet you, but we cannot do that, but know very much that we appreciate your arguments and your helping us on these thorny cases. Be safe and be well. Take care.
judges: Roger L. Gregory, James Andrew Wynn, Stephanie D. Thacker